UNITED STATES *v.* FRED. GRETSCH MFG. CO., INC. (No. 4279)[1]

---

[1] C. A. D. 120.

United States Court of Customs and Patent Appeals, April 29, 1940

*Webster J. Oliver*, Assistant Attorney General (*John J. McDermott*, special attorney, of counsel), for the United States.
*Siegel & Mandell* (*Sidney Mandell* of counsel) for appellee.

[Oral argument April 8, 1940, by Mr. McDermott and Mr. Mandell]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

LENROOT, Judge, delivered the opinion of the court:

This appeal involves the dutiable classification of certain articles imported by appellee at the port of New York. They were classified by the collector under the provisions of paragraph 1513 of the Tariff Act of 1930 as toys and were assessed with duty at the rate of 70 per centum ad valorem.

Appellee filed a protest against such classification and assessment with duty, claiming the merchandise to be dutiable at 40 per centum ad valorem as musical instruments under paragraph 1541 of said tariff act; alternative claims were made in the protests which were abandoned upon the trial.

The protest apparently included merchandise not involved in this appeal.

Upon the trial before the Customs Court appellee limited the issue to the merchandise invoiced as "flutes." Therefore the only issue before us is the dutiable classification of such articles. They were described in the invoice as "3 cases of toys" "Flutes * * * C," "Flutes * * * B," and "Flutes * * * E," and warehouse entry was made under the description: "Three cases musical Inst. as Toys flutes."

The pertinent portions of paragraphs 1513 and 1541 (a) of the tariff act read as follows:

PAR. 1513. * * * all other toys, and parts of toys, not specially provided for, 70 per centum ad valorem. As used in this paragraph the term "toy" means an article chiefly used for the amusement of children, whether or not also suitable for physical exercise or for mental development. * * *

PAR. 1541. (a) Musical instruments and parts thereof, not specially provided for, * * * 40 per centum ad valorem; * * *.

The evidence in the record consists of the testimony of an examiner of merchandise and the incorporated record in the case of *United States* v. *Fred. Gretsch Mfg. Co., Inc.*, involving protest 719492–G, hereinafter referred to as the incorporated record. The importer in that case is the appellee here.

The examiner testified that the merchandise here involved is identical with that involved in the incorporated record. In said incorporated case the Customs Court sustained the protest as to the "flutes," holding the same to be musical instruments. From the judgment accordingly entered, the Government appealed to this court. We did not pass upon the merits of that case, but reversed the judgment and remanded the case upon the ground that the protest failed to comply with section 514 of said tariff act and should have been dismissed. *United States v. Fred. Gretsch Mfg. Co., Inc.,* 26 C. C. P. A. (Customs) 267, C. A. D. 26.

Two samples of the merchandise here involved were introduced in evidence. They are what are commonly known as fifes, the blowhole of a fife being at one end, while ordinarily in a flute the blowhole is in the side of the instrument. They are apparently made of tin, except for a small portion of wood at the mouthpiece. They are tapered in shape and each has six finger holes or stops.

Exhibit 1 is marked "E" and Exhibit 2 is marked "B." It is established that these letters are intended to indicate the musical keys of E and B. The bodies of the articles are black in color, with decorations of a silver color.

One Fred. Gretsch, Jr. testified in said incorporated case that he was the treasurer of appellee and was familiar with the merchandise bought and sold by it. He further testified in part as follows:

Q. Briefly, state what business is conducted by the Fred. Gretsch Manufacturing Company?—A. We manufacture, import, and distribute musical instruments. We travel 22 salesmen, who call on all the music stores in the United States, and sell them instruments of our manufacture and importation.

Q. Do you handle any other class of merchandise than musical instruments?—A. No, we do not.

Q. Music?—A. No music except instruction books.

Q. That relates to the instruments that you manufacture or import?—A. That is correct.

Q. I show you the consular invoice covered by entry 718285, and ask you whether you are familiar with the merchandise described on the invoice as manufacturer's number 1870/2, 4, and 5?—A. I am.

Q. What is that merchandise on that invoice?—A. That merchandise is fifes of this character. The manufacturer calls them flutes, but the general term in this country is fifes.

\* \* \* \* \* \* \*

Q. For how many years do you say you have been handling merchandise similar to the merchandise represented by illustrative exhibits 1 and 2?—A. Practically five years.

\* \* \* \* \* \* \*

Q. And what class of merchandise do you sell to musical instrument stores? Name the types of instruments which you manufacture.—A. We manufacture drums, guitars, banjos, and ukuleles. We imported piano key accordions, clarinets, fifes, and a complete line of musical instruments.

Q. Do you handle any toy articles, or toys?—A. We handle one article that is classified by the United States Government as toys; yes.

Q. What article is that?—A. That is a toy trumpet, and it is more or less automatic playing. There is no necessity for embouchure.

Presiding Judge McClelland. Do you sell that to musical instrument stores?

The Witness. Yes; we have.

By Mr. Mandell:

Q. Have you sold merchandise like items D and E throughout the United States?—A. We have.

Q. You personally?—A. I have taken some orders personally.

Q. To what class of customers have you sold these?—A. Musical instrument dealers.

Q. Have you sold them to professional musicians?—A. We don't do a retail business, but occasionally a professional musician will come into our factory, and they have bought articles of this kind—have bought these fifes.

Q. Have you ever sold them to music schools?—A. We have sold them to organizations that teach—in the public schools.

Q. In selling instruments that are represented by exhibits 1 and 2, do you sell them with or without an accompanying instruction book?—A. Usually with an accompanying instruction book.

Q. Have you with you a copy of the instruction book?—A. I have a copy of the instruction book published by the M. M. Cole Publishing Company, in Chicago, entitled "New Standard Fife or Flageolet Course," by Margaret J. Symneberg. That is the company that publishes it, in Chicago. They publish instruction books.

Q. In the sale of the instruments represented by illustrative exhibit 1, each instrument is accompanied by one of the instruction books?—A. Yes; we have an assortment; we sell the fife with the instruction book.

Mr. Mandell. I offer in evidence the instruction book, and ask to have it marked "illustrative exhibit A."

Mr. McDermott. I object to it, on the ground that it is incompetent, irrelevant, and immaterial. Besides the article is manufactured abroad, and some individual person in Chicago makes up an instruction book for musical instruments. I don't see how that has any direct bearing on the issue here.

Presiding Judge McClelland. Is there anything in the pamphlet that refers to these particular items?

By Mr. Mandell:

Q. Mr. Gretsch, this instruction book, to what does it relate?—A. It relates to the teaching and playing of the fife; how to play a fife.

Q. What particular type of fife—a fife similar to the merchandise here?—A. A fife similar to that one.

Q. Does the instruction book itself describe the instrument?—A. It pictures it.

\* \* \* \* \* \* \*

Q. And how many illustrations are in that book?—A. Ten.

Q. And do all of the illustrations represent merchandise similar to the merchandise represented by illustrative exhibits 1 and 2?—A. They do.

Q. Does the illustration relating to the use or manipulation in that pamphlet relate to the use and manipulation of articles like illustrative exhibits 1 and 2?—A. They do.

Q. And in your sale of all the instruments represented by illustrative exhibits 1 and 2 you have invariably sold that instrument the instruction book represented by the copy which you have in your hand?—A. I would say that with 90% of our sales there are also instruction books.

By Mr. McDermott:

Q. Your instrument is not named in the book at any place?—A. It is not.

The instruction book referred to was received in evidence over the objection of the Government.

Upon cross-examination the witness testified in part as follows:

X Q. Those flutes which you sell, they are much more costly, aren't they?—A. Yes; they are more expensive.

X Q. How do they run—about $2.00?—A. The flutes used in orchestras nowadays, they run around $75.00 retail.

X Q. You said that you sold these articles like illustrative exhibit 1 to organizations?—A. I have.

X Q. Name some of them.—A. I sold them to the New York public schools sometimes, and they use them. Generally our sales to those organizations have gone through the school supply houses, such as the Fond du Lac School Supply Company, of Fond du Lac, and the Garden City Education Supply Co., of Chicago, who buy from us and sell them direct to the teaching organizations.

The witness on redirect examination testified in part as follows:

R. D. Q. Have you sold any instruments such as illustrative exhibits 1 and 2 to professional musicians?—A. Yes; I have.

R. D. Q. You personally have sold them. Do you recall the names of those musicians?—A. Yes; I recall the name of Latham, who came in and bought them.

The witness further testified that appellee sells instruments similar to the exhibits in evidence at wholesale for $1.50 per dozen.

One King Ross, a witness for appellee, testified that he was a professional musician of long experience, that he calls the articles here involved "a fife, or a tin fife, flageolet," and that he has played instruments like those here involved. He then gave a demonstration by playing upon one of the exhibits the tunes of "Dinah" and "Yankee Doodle." The witness further testified:

Q. * * * Have you seen instruments represented by illustrative exhibits 1 and 2 used?—A. You mean those tin fifes?

Q. Yes.—A. I have several friends who play them in orchestras just the same as I do. I mean they play them as a solo instrument, but not alone. They have an orchestra accompanying them.

* * * * * * *

Presiding Judge McClelland. Can you play a scale on this instrument?

The Witness. I can, if you want me to.

By Mr. Mandell:

Q. Can you play an octave?—A. Yes. You have got a range on the instrument. You have two octaves and a half.

Q. Is it possible to play half tones on this instrument?—A. It is, but with great practice. * * *

* * * * * * *

Q. Have you used this instrument for the purpose of playing solos in connection with orchestra renditions, in radio programs?—A. Yes, sir.

Q. And in duets?—A. Yes, sir.

Upon cross-examination the witness testified:

X Q. You testified that you used articles like illustrative exhibits 1 and 2 in orchestras; is that correct?—A. Yes.

X Q. Have you played solos with articles like illustrative exhibits 1 and 2?—A. Yes.

X Q. How many times have you used articles like exhibits 1 and 2, roughly?—A. I would probably play six or seven different jobs a week, and out of those I may be called upon once or twice, or three times in the different organizations.

Presiding Judge McCLELLAND. Have you done it frequently?

By Mr. McDERMOTT:

X Q. Have you seen other people use articles like exhibits 1 and 2?—A. Yes.

X Q. Have you ever seen children under 12 or 14 years of age use articles like such exhibits?—A. No; not to my recollection.

X Q. How many times have you seen other people use articles like exhibits 1 and 2, roughly?—A. Dozens of times; frequently.

 \* \* \* \* \* \* \*

X Q. Could you name some orchestras that use articles like exhibit 1?—A. Meyer Davis, Joe Marks music, and Frank Novak's orchestra; and there are others I could name. When I am sitting at home listening to the radio I hear the tin flutes many times on the air, but I don't remember the names of the orchestra.

 \* \* \* \* \* \*

X Q. How many different other people have you seen use articles like exhibits 1 and 2?—A. Personally, I have seen five.

X Q. Three, four, or five people using articles like illustrative exhibits 1 and 2?—A. Yes; as I say where I would be in the orchestra playing it, someone else would be in another orchestra playing it.

X Q. You have seen thousands of musicians playing in orchestras?—A. Yes, sir.

During the cross-examination of this witness it was stipulated that the "flutes" here involved are similar to certain of the merchandise involved in the case of *United States* v. *Sears, Roebuck & Co. et al.*, 23 C. C. P. A. (Customs) 348, T. D. 48209. The record in this case was offered in evidence by the Government but the trial court made no ruling with respect to its admission.

A sample of the merchandise involved in the *Sears, Roebuck & Co.* case, and there marked Exhibit 10, was without objection received in evidence in the case at bar, the same being marked Illustrative Exhibit B. After the receipt in evidence of said exhibit, the witness gave a demonstration on the same by playing the "Merry Widow Waltz," and immediately thereafter played the same tune upon Illustrative Exhibit 1, being one of the samples of the merchandise here involved.

Upon the conclusion of the testimony of the witness Ross appellee rested its case, whereupon three witnesses testified in behalf of the Government.

We have quoted from the testimony in behalf of appellee at considerable length for the reason that the first question to be determined is whether such testimony was sufficient to overcome the presumption of the correctness of the classification made by the collector. If it was not, there being no other evidence rebutting such presumption, it will be unnecessary to consider other questions raised by the Government.

Under the classification of the collector the presumption was, at the beginning of the trial before the Customs Court, that the involved articles were toys chiefly used for the amusement of children. In order for appellee to succeed, the burden was upon it, first, of negativing this presumption, and, second, of establishing that the articles were dutiable under paragraph 1541 (a).

We are compelled to come to the conclusion that appellee did not meet this burden. The fact that appellee imports and sells articles like those here involved only to musical dealers, musicians, and for use in schools, does not establish, *prima facie*, that such articles as generally used in the United States were not chiefly for the amusement of children. There is nothing in the testimony of appellee's witness Gretsch which negatives such use. His concern, being engaged solely in the musical instruments business, would naturally sell articles such as are here involved only to music dealers and to schools giving musical instruction. Such practice would indicate only that the articles were not used exclusively for the amusement of children. In fact the witness testified that his concern handled one article clearly a toy, denominated by the witness as a toy trumpet, and sold the same to musical instrument stores.

The witness was not asked if he was familiar with the use of articles like those here involved, sold by other concerns in the United States, and he gave no testimony upon that subject. Neither did he testify with respect to the use of such articles by children for amusement or otherwise.

The testimony of appellee's other witness, Ross, related almost entirely to the use of the articles by musicians, and except for one statement by him there is nothing in his testimony inconsistent with the finding by the collector that they were chiefly used for the amusement of children. That statement was as follows:

X Q. Have you ever seen children under 12 or 14 years of age use articles like such exhibits?—A. No; not to my recollection.

This is the only testimony in the record which it might be contended was inconsistent with a holding that the articles are chiefly used for the amusement of children.

Testimony might have been introduced as to whether or not such articles were usually sold in the toy departments of stores, but neither party offered any such testimony.

In the *Sears, Roebuck & Co.* case, *supra*, testimony of this character was regarded by us as significant.

Also, testimony might have been introduced through witnesses who were familiar with children's play as to whether or not such articles were used by children for purposes of amusement, but there is no such testimony.

As to the testimony of the witness Ross that, to his recollection, he had never seen children under 12 or 14 years of age use such articles, it does not appear what, if any, opportunity he had for observing the play of children, and we cannot hold that this testimony is sufficient to overcome the presumption of the correctness of the classification by the collector.

It is well established that a sample of merchandise involved is often a potent witness in a classification case. A sample in its construction and appearance might in itself negative any presumption that merchandise of that character was chiefly used for the amusement of children. To illustrate, if we had a highly finished flute before us, sold at a high price, it would in itself negative any presumption that it was chiefly used for the amusement of children.

With respect to the samples before us, we cannot agree with the trial court in stating in its decision in the incorporated case that the samples support appellee's claim. They are cheap articles selling at $1.50 per dozen at wholesale, made of tin very crudely finished, and while it may be that they should be classified as musical instruments if oral testimony established that they were not chiefly used for the amusement of children, the samples themselves do not warrant such classification independent of such testimony.

We have not here quoted or analyzed the testimony introduced in behalf of appellant, and it is only necessary to say that we find nothing therein which supports appellee's claim.

In view of our conclusion, it is unnecessary for us to consider any assignments of error of appellant except that which assigned error by the trial court in holding that appellee had sustained its burden of proof to establish that the collector's classification and assessment with duty was erroneous.

To summarize our views, we hold that the fact that articles like those here involved can be used for musical purposes and are so used by musicians in orchestras and are used in schools, does not negative the finding by the collector that they are chiefly used for the amusement of children; and in order for appellee to succeed it was incumbent upon it to produce satisfactory testimony upon this point, which it has failed to do.

In the case of *United States* v. *Sears, Roebuck & Co. et al., supra,* which involved in part articles similar to those before us, we discussed the legislative history of paragraph 1513, especially with reference to the phrase "whether or not also suitable for physical exercise or for mental development," which phrase was not included in prior tariff acts, and with reference thereto we said:

* * * From this legislative history, it seems quite evident that this amendment was added to clarify situations such as caused this court to view the *Bernard, Judae & Co. et al.* case, *supra,* as a border line case. From this amendment it is equally evident that if an imported article was used chiefly for the amusement

of children, it was, for customs purposes, a toy, and *it was not important what its other or incidental uses might be.* [Italics ours.]

So here, the mere fact that the articles here involved had the uses shown by appellee is not inconsistent with a finding that they were chiefly used for the amusement of children.

For the reasons herein stated, the judgment appealed from is *reversed* insofar as it sustained the protest of appellee.